Good morning, Your Honors. Arwin Swink, appearing on behalf of the Petitioner. I'm sorry, could you spell that? Because it's different from what I've got on my sheet. Yes, Your Honor. Arwin, A-R-W-E-N, Swink, S-W-I-N-K. Okay, and you're out of Mr. Job's office? Yes, Your Honor. Okay, thank you. And I'm appearing on behalf of the Petitioner, Mariana Gamalie. Gamalie, okay. In affirming the Immigration Judge's decision, the Board of Immigration Appeals made numerous errors. There are, however, two errors which are particularly egregious, to which I would like to direct the Court's attention this morning. First, although the Immigration Judge noted that Ms. Gamalie was subject to serious economic harms, which Ms. Gamalie testified threatened her very economic survival, the Immigration Judge failed utterly to apply the law as articulated by this circuit to that finding. Second, in concluding that Ms. Gamalie's persecutors were not motivated to harm her because of a protected characteristic, the Immigration Judge ignored Ms. Gamalie's undisputed testimony about her own religion and political opinion, as well as statements made by her persecutors expressing their intent to harm her because of those two characteristics. The I.J. further ignored this Court's repeated statements that the existence of an economic motive does not negate the presence of a political or religious motive for persecution. Because these errors fatally undermine the Immigration Judge's decision, this Court must reverse the Board's findings and remand this case for further proceeding. So is your argument that it was actually her religion that motivated the economic harm that was visited upon her? There were two motives, Your Honor, two principal motives, although she also indicated that her gender was a source of problems. Principally, it was her political opinion and her religion. In 2001, Ms. Gamalie converted to the Evangelical Church. And as she noted, after that conversion, the problems which she was experiencing with the Romanian authorities increased, quote, as if gas had been poured on a fire. She also made her opposition to the ruling party publicly clear, and she notes that in page 169 of the record. Ms. Gamalie explicitly told the Romanian officials that she did not join the party because she did not agree with their policies and practices. In spite of this, the members of the Romanian government pressured her almost daily to become a member of the ruling party. And this was in part, as she testified, because as a business owner, she was expected to ensure that her employers would give them, that as an employer, she would be able to provide the ruling party with the votes of her employees. Let me understand how the law works with respect to the facts as to her political opinion. It sounds as though she just wants to stay out of politics and leave me alone. And the party keeps pressuring her, join us. And she says, I don't want to because I'm not a political person. I just want to run my business the way I ought to. I think that's a plausible characterization of her testimony. Is that a protected ground when she says, listen, just leave me alone, I don't want to be a member of your party? Your Honor, political neutrality can be a political opinion for the purposes of asylum law, but I think actually your characterization parallels the immigration judge's characterization. But I don't think that's really supported by Ms. Gamalie's testimony, in which she explicitly stated that she did not agree with the PDSR's policies. She was very clear about her opposition to the way that they were doing business and the way in which they were essentially running the Romanian government. Okay. Assuming that we have bad treatment on account of these two protected grounds then, religion and political opinion, how much of the harm that she is suffering is attributable to that, and how much of the harm that she's suffering is attributable just to the ordinary corruption that exists in Romania? That is to say, it sounds as though anybody running a business, even a member of the party, has to make payments and do these various things that's part of the corruption. I think that was the conclusion that the immigration judge reached, and there is no dispute that corruption is endemic in the Romanian government. So my question is, how much of the economic harm that she's suffering is due to these two protected grounds? I think the best way to answer that question would be to refer to Ms. Gamalie's testimony, in which she compared the harms that she suffered with the harms suffered by other business owners. She said, yes, everyone was expected to pay bribes, but the degree to which other business owners were extorted was very small compared to the degree to which Ms. Gamalie was targeted. At page 664 of the record, she noted that other business owners who supported the ruling party were expected to pay much smaller sums. They were also encouraged to do business on the black market to earn additional money, encouraged by the Romanian government, that is. And they were, quote, almost guaranteed easy access to government protection and benefits. That's at page 190 of the record. And I think most significantly, other business owners are not subject to the type of economic sanctions which Ms. Gamalie was subjected to. For example, she was deprived of an entire year's proceeds from her alcohol, tobacco, and coffee sales, which, as we all know, were a substantial part of the business. And her husband was subjected to the forced relinquishment of a controlling interest in his business. Notably, at the time of the hearing, Mr. Gamalie was no longer receiving any proceeds from that business, even though he was still a part owner, and had initially owned more than 99 percent of that business. So effectively, he was forced to relinquish the entirety of his business to PDSR officials, immediately following his decision to refuse to continue to pay them bribes. So I think what's clear from those instances is that the type of harms, economic harms specifically, Ms. Gamalie was subjected to, were much more severe than what was sort of standard business practice. I share the same question that Judge Fletcher asked you about. Let's take the unwanted business partner aspect of the case. Is there any way from this record that we can tell whether your clients were singled out by virtue of their politics or religion? Or is this just part of the general corruption that charges are trumped up against you, and then some angel comes along who, for a very steep price, will make that problem go away, and now you suddenly have an unwanted business partner? I completely understand Your Honor's concern on this. But I think that by looking to the statements of the Romanian authorities is where we can really see what was motivating them. Ms. Gamalie was expressly told that she was threatened, quote, almost daily that it would be to her own good if she were a member of the party. When she objected to the government's extortion, she was told, quote, this is at page 163 of the record, if you don't want to join the party, you will have to suffer. Additionally, at page 44, it's noted that Ms. Gamalie's mother was told that Ms. Gamalie had offended the party and would have to suffer the consequences accordingly. If it's all right, Your Honors, I'd like to reserve my time for rebuttal. I was just going to mention, if I may give a personal example, in the evidence of police persecution, there was a statement that they refused to respond. That is happening here in the United States. We have policy in Las Vegas now where the police don't respond to auto thefts. I've had personal experience that they don't respond to complaints for vandalism. They'll take a report a week or two later, but they don't send out people anymore. So that's not just Romania. We have that here.  Okay. Thank you, Your Honor. Okay. Thank you. You're safe some time. Thank you. Ms. Perry. May it please the Court, Roseanne Perry on behalf of the Attorney General. The primary issue before the Court today is whether substantial evidence supports the immigration judge's finding that Mrs. Gamalie is not eligible for asylum, withholding of removal, and cap protection. Also before the Court is whether the Board properly exercised its discretion in denying Mrs. Gamalie's motion to reopen. The agency's decision can only be reversed if a reasonable fact finder could be compelled to conclude that the requisite fear of persecution exists. In this case, the record does not compel the conclusion that Mrs. Gamalie suffered past persecution on account of her political opinion or religious beliefs. Moreover, the Board properly exercised its discretion denying her motion to reopen where the affidavits provided by her family and friends did not establish prima facie eligibility for asylum. I wanted to point out that although counsel noted or stated that Mrs. Gamalie asserted a claim based on her gender, it wasn't exhausted before the Board, so that would need to be remanded. In regards to her complaints of the incidences where she was persecuted, they were actually claims of harassment. She claimed that she suffered economic persecution because she was made to pay bribes. However, the I.J. found, or the immigration judge found, that this was merely an indication of corruption. In both instances. But the testimony that we take is clear. The I.J. believed the testimony. Her testimony is very clear that while there is bribery throughout the society, she was forced to pay substantially more because of her unwillingness to join the party and her expression of disagreement with the party's aim and because of her religion. Correct? There wasn't an expressed credibility determination. Therefore, we treat it as credible. Yes. And what she testifies to is, as I recall from reading the testimony, that she had to pay a great deal more because of her evangelical religion and because of her refusal to join the party. But there's no indication of the amount that she had to pay. Well, no, there's a fair amount of indication, although she doesn't attach, you know, she doesn't say $25, but she says the others were required, the party members and so on, they were required to pay small amounts. But I, by contrast, was forced to give them the profit for an entire year from my shop. Well, yes, she did say she had to give them profits from the entire year, but both her husband and Mrs. Gamali admitted that this type of bribery was persistent throughout different administrations. It happened during the Konstantinescu administration. It would happen while PDSR was in power. So I, they, yes, they were paid, asked to pay more. But this is, it's just like a continuation of what had been going on before. Let me make sure we're on common ground, or at least to the extent that we can be, that we are on common ground. Let's assume, and I'm making these numbers up, these are not numbers in the record. Let's just say that all party members are required to pay a dollar a year in corrupt sort of extortion, whereas people who are evangelicals and not members of the party are required, because they are evangelicals and not members of the party, are required to pay $100 million a year. Okay. Would that be persecution? I wouldn't, it's a substantial amount of money. I think if it's on account of a protected ground, and in this case, she was not asked to pay a bribe based on her religion. Her testimony is that she was asked to pay these additional amounts because of her religion and because of her refusal to join the party. That's what she testified to. Yes, that is what she testified to. But the immigration judge found that she was mocked and harassed because of her religion but not made to pay bribes based on her religion, which is, you know, the finding in here. And substantial evidence does not compel the conclusion that she was made to pay the bribes based on her religion. But if he, if her testimony was that she paid the bribes because she wasn't a member of the party, then that's an alternative protected ground, is it not? The evidence doesn't show that she was made to pay the bribes just because she wasn't a member of the party, because everybody else was made to pay the bribes. But her testimony was, I had to pay higher bribes because I was not a member of the party. Yes, that is her testimony. So what evidence exists in the record to support the IJ's contrary determination? Like I said, that the fact that everybody had to pay from, you know, this is a usual occurrence in Romania, that they have to pay bribes and it's just a part of doing business in the country. That is what supports the IJ's decision, that it's customary to pay bribes in the country. But I don't think you're engaging with our questions. Our questions are, what if she has to pay more on account of discrimination based on a protected ground? Then that, if it's the deliberate imposition of substantial economic disadvantage, yes, on account of a protected ground, it is economic persecution. Right. And then how severe does that economic deprivation on account of a protected ground have to be before it becomes persecution? Well, in other cases, such as in Babala, he was deprived of making a living. In this case, she was not deprived of making a living. She was still able to support her family. You know, she was allowed to work and carry out her usual business. And in your view, it's not enough that she is forced to pay the profits of an entire year and not enough that her husband has effectively lost any ownership or control over his business? Well, there's no evidence to show that he didn't actually owe the loans, you know, that the judgment wasn't justified. I mean, he still retained 33% of his business. This is his choice to leave Romania. And he says that he can, you know, go to court, an international court, and try to receive those funds back. So it's not like he doesn't have any recourse here. So is your position that our cases, talking about economic coercion, require the alien to be essentially put out of business, completely deprived? I have in mind the case where the Israeli Marines shot up the fishing boat. Babala, yes. Is that the Babala case? Mm-hmm. I mean, that's pretty severe. Is your position here that, okay, maybe she had to pay pretty steep bribes, but she was still able to continue in business and still able to earn a living? Yes, she was able to earn a living and still continue. And Babala, he trained to become an accountant. He trained to become a diver. He wasn't able to work in either of those positions. I mean, she had an opportunity to work before she opened her own business. She wasn't deprived of any opportunities before. Also, I wanted to also mention that the administration has now changed. There's now a new president and a new prime minister who are members of the Justice and Truth Alliance, and there's evidence in the records to show that they are trying to end this corruption in Romania. So now she has her well-founded fear of persecution is not as strong as she has made it out to be. And she has failed to meet the lower burden of proof for asylum. She hasn't necessarily failed to meet the high burden of proof for withholding of removal. And in addition, she has failed to mention or claim any torture in Romania. Therefore, her claim for cap protection should be denied. Are there no further questions? I think not. Thank you very much. Thank you. Ms. Swink, you saved a little time. Thank you, Your Honor. As far as the change in administration in Romania, that's a factual question, which the IJ or the Board never had an opportunity to address. Regarding the likelihood that Ms. Gamalia would face harm on her return to Romania, the changing government simply cannot be found to be dispositive. Would you compare the level of economic deprivation that she has suffered to the other cases, the fishing boat shot up by the Israelis and the other cases? Yes. My problem, frankly, is I'm not sure she's got quite enough. Okay. Absolutely. The absolute inability to support oneself has never been required by this court. In fact, that requirement has been expressly rejected. Ms. Gamalia, however, has clearly stated that her very economic survival was threatened by these almost daily demands for extortion. The deprivation of over a year's worth of proceeds and the forced relinquishment of her husband's business. So I think when comparing the cases, the case that's more on point is Sarita v. INS, and that's 95 F. 3rd 814. I'm over time. Would you like me to continue? Okay. Thank you, Your Honor. As with Sarita, who was robbed approximately seven or eight times by members of the Fijian Army, Ms. Gamalia was robbed and extorted almost daily by government officials who also stole merchandise from her store, and she was forced to pay these exorbitant sums, which we've already discussed. Whereas Ms. Sarita was compelled to quit her job of ten years, government officials threatened to shut Ms. Gamalia's business down, and ultimately she was forced to close it because of this severe economic deprivation to which she was subjected. Okay. Further questions from the bench? No. Thank you very much for your argument. And if you need to sign something with the courtroom deputy, please do so. The case of Gamalia v. Mukasey is now submitted for decision.
judges: W. Fletcher, Tallman, Dawson